SO ORDERED.

SIGNED this 3 day of February, 2017.

_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| SKIN SENSE, INC. | 16-05626-5-JNC |
| DEBTOR | |

## MEMORANDUM OPINION REGARDING POSTPETITION GIFT CARD PROCEEDS

The matter before the court is the Motion to Establish Procedure Regarding Debtor's Use of Gift Cards (Dkt. 20; the "Procedure Motion") filed by the Debtor on November 4, 2016, as revisited by the Debtor in various subsequent motions as referenced below. A hearing on the Procedure Motion was held on November 8, 2016 in Raleigh, North Carolina, at which the court denied on an interim basis the Debtor's request to continue using all proceeds received from gift cards sold after the filing of this chapter 11 case in its ordinary business operations. Per the court's instructions issued from the bench on that date, and as set forth in the written order entered on December 1, 2016 (Dkt. 100), the Debtor was required to segregate all gift card related sale receipts into a separate account pending further hearing on the matter.

Thereafter, at the invitation of the court, the Debtor filed a Memorandum of Law in response to the court's decision regarding the Procedure Motion (Dkt. 114), seeking authority to use all proceeds generated from postpetition gift card sales in the course of ordinary daily business operations, in keeping with its practice prior to the filing of its chapter 11 case. A second hearing on the subject was held on December 21, 2016 in Greenville, North Carolina, following which pursuant to instructions issued by the court from the bench, the Debtor was permitted to continue selling gift cards in the course of normal business operations. However, the Debtor was allowed to use in its business operations only fifteen percent (15%) of postpetition gift card sale proceeds, with the balance to be held in a segregated bank account pending redemption of the gift card. Once redeemed, the previously deemed unearned eighty-five percent (85%) sale proceeds could be recognized and transferred to the Debtor's operating account for use pursuant to cash collateral orders entered in the case. As discussed below, at each subsequent cash collateral hearing and upon two motions to provide adequate protection, the Debtor sought to alter the retention/segregation ratio or otherwise obtain full use of the segregated account proceeds, all of which have been denied from the bench and in written orders. This Memorandum Opinion serves to further explain the reasons and basis for the court's decisions.

## JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. § 157, and this court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334 as it directly pertains to an asset of the bankruptcy estate in the form of postpetition sales proceeds pursuant to 11 U.S.C. § 541. This court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

## BACKGROUND

Skin Sense, Inc. (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 28, 2016. The Debtor is a North Carolina corporation founded and incorporated in 1994 by Ms. Diana Angela Padgett ("Ms. Padgett"), who is the Debtor's sole owner and serves as its president. As of the petition date, the Debtor operated two day spa locations in Raleigh, North Carolina, where it provided various beauty and spa treatments along with related services, and sold associated products. It employed approximately fifty individuals. The Debtor owns commercial real estate consisting of a strip shopping center located at 6801 Falls of Neuse Road in Raleigh, North Carolina (the "North Raleigh Location"), which houses its corporate office and one of its spa business operations, with the remaining commercial space leased to other businesses.  At the time the petition was filed, the Debtor leased the property that housed its second location in northwest Raleigh at the Brier Creek Commons shopping complex (the "Brier Creek Location"), which location has since closed. The Debtor also owns real estate consisting of a vacation home and lot on a mountain lake in Virginia, a partial interest in a mobile home park, and personal property including three vehicles, various pieces of spa equipment and related inventory, and office furnishings and equipment.

Several factors reportedly contributed to the filing of the Debtor's chapter 11 petition. Prior to the filing of the petition, the lessor for the Brier Creek Location initiated a summary ejectment proceeding in state court due to the Debtor's failure to pay monthly rent. Additionally, in the two months immediately preceding the petition filing, the Debtor experienced a large turnover of employees and several changes in management at the Brier Creek Location, leading to a disruption in services.  In addition, various low-cost competitors entered the market in close geographic proximity to the Brier Creek Location, weakening the Debtor's customer base and revenue.

3

## DEBTOR'S MOTIONS REGARDING USE OF GIFT CARDS

Prior to filing the petition, the Debtor sold gift cards at both physical locations and through its website. The gift cards could be redeemed for services or for physical goods, such as beauty products, at either location. Ms. Padgett testified that no more than one percent of gift cards were redeemed for goods. Pre-petition, upon the sale of a gift card, the Debtor immediately deposited all of the sale proceeds into its general operating account without regard to when or if the promised services would be or could be performed, therefore commingling those unearned funds with money generated by all non-gift card sales. Although testimony regarding the historical proportion of gift card sales to overall sales has varied widely (somewhere between one-fifth and one-half of all sales), the Debtor concedes that a large portion of its income starts as gift card sales, particularly around the December holidays, Valentine's Day in February, and Mother's Day in May.

On November 4, 2016, the Debtor filed the Procedure Motion in which it sought authority to "maintain" various customer programs[1] and honor gift cards sold pre-petition. As of December 12, 2016, pre-petition gift cards in the approximate amount of $215,000 remained unredeemed.[2] From testimony offered at the hearing, the Debtor contends that it lacks information as to the identities of pre-petition gift card purchasers and holders, but its representatives assured the court that the costs associated with redemption were relatively minimal. In the Procedure Motion, the

---

[1] In addition to seeking approval of the sale of gift cards and use of proceeds, the Debtor requested authority to: (1) continue providing returns, exchanges, and refunds; (2) continue donating and honoring occasional gift cards to charitable organizations; and (3) continue offering specials and promotions. The court granted the Debtor authority to continue all of those activities, as they had a collectively *de minimis* effect on the Debtor's budget.

[2] This estimated amount was derived from the conflicting information provided by the Debtor at the December 12, 2016 hearing (Debtor's Ex. H) and is based on appropriate "breakage rates" to account for the fact that the likelihood of redemption decreases as time passes. Pre-petition gift cards sold by the Debtor did not list an expiration date, but it is fair to say that few gift cards more than two years old will likely ever be redeemed.

4

Debtor also impliedly sought the court's approval to continue to sell postpetition gift cards by requesting the authority to maintain its pre-petition customer programs, including the sale of gift cards in the ordinary course of business. More specifically, the Debtor sought not only to continue to sell gift cards postpetition, but also to use the proceeds generated therefrom immediately in the course of its normal business operations, rather than holding back any unredeemed and unearned proceeds.

At the November 8, 2016 hearing, the court conditioned the continued sale of gift cards upon the segregation of all postpetition gift card proceeds into a separate debtor-in-possession account to secure the possible administrative claims of postpetition gift card purchasers if services later could not be performed. *See* Dkt. 100. The Debtor complied with the court's order and segregated the proceeds. At the December 12 hearing, the Debtor provided more complete accounting records, which among other things established that historically fifteen percent of gift cards are never redeemed (the "breakage rate"). Given this additional information, the court allowed the Debtor to deposit fifteen percent of the proceeds received from each gift card sold into its general operating account for immediate use (subject to cash collateral restrictions), while retaining the remaining eighty-five percent in the segregated gift card proceeds account until card redemption. When a card was subsequently redeemed (in whole or in part), proceeds for the corresponding usage could be transferred from the segregated account into the operations account.

Notwithstanding the court's orders on gift card sale proceeds treatment from the Procedure Motion, the Debtor again sought to obtain immediate access to all of the gift card sale proceeds by requesting authority to grant alternative or replacement adequate protection to holders of unused postpetition gift cards in the form of a junior lien on the North Raleigh commercial real estate rather than in the form of funds held in the segregated debtor-in-possession account (Dkt. 129; the

5

"Adequate Protection Motion"). A hearing was held on December 20, 2016, in Greenville, North Carolina. The court denied the Adequate Protection Motion in an order issued the next day (Dkt. 149). The Debtor then filed a second motion for adequate protection on January 9, 2017 (Dkt. 182; the "Second Adequate Protection Motion"), seeking identical relief but with further evidence of the underlying real estate value. A hearing was conducted, but the relief sought in the Second Adequate Protection Motion was denied in an order entered on January 20, 2017 (Dkt. 220). Essentially, the court continued to restrict the Debtor's immediate use of gift card sale proceeds beyond the breakage rate portion as the replacement adequate protection offered by the Debtor of a junior secured position on the North Raleigh Location was inadequate as discussed below.

## ISSUES

In the series of related motions discussed above, the first issue raised was whether the Debtor was permitted to honor gift cards sold pre-petition and to sell new gift cards postpetition. If so, the second issue considered was whether funds generated from sales of postpetition gift cards must be held in a segregated debtor-in-possession account prior to redemption, and if so, to what extent. The third question became whether the Debtor could use all postpetition gift card proceeds, prior to redemption, by granting postpetition gift card purchasers adequate protection in the form of a junior lien on its real estate.

### 1.    Gift Cards, Generally

A gift card is "[a] record evidencing a promise, made for monetary consideration, by a seller or issuer that goods or services will be provided to the owner of the record to the value shown in the record . . . ." N.C. Gen. Stat. § 66-67.5. From an accounting perspective, a gift card represents an incomplete transaction, as the customer has provided good funds but has not yet received the contemplated good or service. As a result, unused gift cards exist as a net liability to a business.

6

Charles Owen Kile, *Accounting for Gift Cards*, J. ACCT. (Nov. 2007). Because of this, many businesses ordinarily hold proceeds from gift cards in separate deferred revenue accounts. Upon the redemption of a gift card, which completes the transaction for both the business and the consumer, a business will transfer funds from the deferred revenue account into its operating account and record the liability as satisfied. *Id*. In the context of bankruptcy, funds received from gift cards amount to unsecured debt for a debtor, and those individuals that purchased gift cards are accordingly unsecured creditors.

### 2. Postpetition Authority to Honor Pre-Petition Gift Cards

It is not uncommon for a chapter 11 retail debtor to seek authority from a bankruptcy court to honor gift cards issued pre-petition as a means to foster goodwill with its customer base and to ensure customers' continued patronage during and following reorganization. *See, e.g.*, *In re The Wet Seal Inc., et al.*, Case No. 15-10081-CSS, Dkt. 95 (Bankr. D. Del. Jan. 20, 2015) (allowing chapter 11 retail debtor to continue to honor gift cards in the ordinary course of business and at the debtor's discretion). Courts routinely grant such motions and recognize the benefits inherent in affording such relief. *Id*. In addition to maintaining goodwill and preventing damage to a debtor's reputation, courts grant chapter 11 debtors broad discretion as to whether to honor gift cards and to what extent based upon the debtor's business judgment. *See In re Hancock Fabrics, et al.*, Case No. 16-10296-BLS, Dkt. 49 (Bankr. D. Del. Feb. 3, 2016) (allowing the debtors to honor pre-petition gift cards but imposing an aggregate redemption limit in the amount of $2.4 million). Such orders are commonly issued pursuant to 11 U.S.C. § 105(a). *Id*.

Honoring pre-petition gift cards is not without cost to a debtor. A retail debtor incurs ongoing expenses to operate its stores and pay its employees, in addition to the cost of the actual inventory for which a card is redeemed. Further, in a retail liquidation situation, redemption of

pre-petition gift cards generally results in a reduction of physical inventory, which in turn depletes the aggregate value of the bankruptcy estate available to satisfy creditors. Nonetheless, retail gift card holders are often afforded an opportunity to purchase physical inventory in exchange for gift cards through "going out of business" sales, even if a deadline to do so is imposed. *See In re Sports Authority Holdings, Inc., et al.*, Case No. 16-10527-MFW, Dkt. 2081 (Bankr. D. Del. May 24, 2016).

In this case, gift cards are primarily sold and redeemed for services, as opposed to goods. A services debtor incurs wage and inventory expenses upon gift card redemption, but Ms. Padgett testified that the related cost of goods is nearly negligible. Additionally, the court agrees that the value in retaining customers and maintaining goodwill greatly exceeds the net costs associated with redemption of gift cards issued pre-petition. Accordingly, pre-petition gift card holders should be allowed to redeem those cards so long as the Debtor remains operating in chapter 11. For these reasons, and upon the withdrawal of objections by creditors, the court allowed the Debtor to honor all outstanding pre-petition gift cards in an order entered on December 1, 2016. Dkt. 100.

### 3.    Treatment of Pre-Petition Gift Card Claims in Bankruptcy

The Bankruptcy Code does not explicitly provide for the treatment of pre-petition gift card claims. If not honored by a court, holders of unredeemed pre-petition gift cards would only have monetary claims, at best, as priority creditors holding deposits pursuant to 11 U.S.C. § 507(a)(7), and at worst, as general unsecured creditors. *See In re City Sports, Inc., et al.*, 554 B.R. 329 (Bankr. D. Del. 2016) (finding that unredeemed, pre-petition gift cards did not constitute deposits under 11 U.S.C. § 507(a)(7) and should be treated as general unsecured claims); *compare In re WW Warehouse*, 313 B.R. 588 (Bankr. D. Del. 2004) (holding that unredeemed, pre-petition gift

certificates were entitled to priority treatment pursuant to 11 U.S.C. § 507).[3] Case law regarding the treatment of pre-petition gift card holders is scarce, and the cases available focus on gift cards of retail debtors.

In cases involving liquidating retailers, courts have implemented various approaches to allow consumers to redeem gift cards and avoid the claims process, such as setting deadlines by which a gift card must be redeemed or establishing express conditions for redemption. *See Sports Authority* at Dkt. 2081 (establishing a thirty-four day window within which customers could redeem pre-petition gift cards); *see also In re The Sharper Image Corp.*, Case No. 08-10322-KG, Dkt. 189 (Bankr. D. Del. Mar. 7, 2008) (allowing redemption of pre-petition gift cards so long as customers spent twice the value of the card). Unless a bankruptcy court orders otherwise, once the retailer files bankruptcy, individuals holding pre-petition gift cards of a liquidating retailer are simply priority or unsecured creditors who must file a proof of claim before the claims bar date.

### 4.    Treatment of Postpetition Gift Card Claims in Bankruptcy

While case law on the subject is lacking, the Bankruptcy Code is considerably clearer as to the status and treatment of postpetition gift card claims. Section 364 of the Bankruptcy Code provides that a debtor-in-possession may "obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) . . . as an administrative expense." Administrative expenses, as defined by 11 U.S.C. § 503(b), include "the actual, necessary costs and expenses of preserving the estate. . . ." The Bankruptcy Code affords priority to administrative claimants over other priority claimants and general unsecured creditors. 11 U.S.C. § 507(a)(2).

---

[3] The court makes no finding as to the status or treatment of pre-petition gift card claims, as that issue is not presently before it.

In this case, the funds generated by postpetition gift card sales amount to an unsecured loan, premised on the promise that those purchasers will one day receive goods or services in the future for their cash at the present. Those individuals purchasing gift cards postpetition are therefore unknowingly postpetition debtor-in-possession lenders, with individual claims typically totaling no more than $400 apiece. Accordingly, the continued sale of gift cards following the filing of a petition would be ordinarily governed by 11 U.S.C. § 364, with claims based on postpetition gift card sales entitled to administrative claim status and treatment pursuant to 11 U.S.C. §§ 364(a), 503(b), and 507(a)(2).

### 5.    Postpetition Authority to Continue to Sell Gift Cards

Many chapter 11 retail debtors voluntarily elect to discontinue gift card sales upon the filing of a petition to avoid additional administrative claims or to prepare the business to be sold. On the other hand, chapter 11 debtors occasionally seek authority to continue to sell gift cards postpetition in the ordinary course of business as part of continuing "customer programs" that existed prior to the filing of the petition. *See In re Quiksilver, Inc., et al.*, Case No. 15-11880, Dkt. 65 (Bankr. D. Del. Sept. 10, 2015) (granting authority to "continue, replace, implement, modify, and/or terminate any customer programs . . . without further application to the court"). If granted, courts frequently require debtors to maintain detailed records of postpetition gift card sales. *See, e.g.*, *In re Hancock Fabrics, et al.*, Case No. 16-10296-BLS, Dkt. 49 (Bankr. D. Del. Feb. 3, 2016) (ordering that "to the extent that the Debtors issue gift cards postpetition, the Debtors shall implement a procedure to differentiate whether a gift card was issued prior to or after the petition

date"). In cases such as these, debtors otherwise continue to sell and redeem gift cards as if not in bankruptcy, and no further conditions are placed upon the use of gift card proceeds.[4]

Here, the Debtor seeks to analogize its current case and position to those of large chapter 11 retail debtors who were permitted to continue to sell gift cards postpetition without restriction. However, the facts of this case differ substantially from those in cases where courts have agreed to allow unrestricted continued postpetition sale of gift cards and use of proceeds postpetition. First, the Debtor is a small business entity with limited assets and limited access to additional capital. The Debtor is not a large corporation with a presence in nearly every state and a nationwide retail website; rather, it owns and now operates a single location in Raleigh, having closed the Brier Creek Location on or about December 23, 2016.

Also, the Debtor is not a retailer with vast stores of physical inventory available to sell and generate a fund for a return to customers. In retail store cases where the debtor business closes, timeframes are typically set to permit an orderly asset liquidation or "going out of business" sale. Because the Debtor is primarily a service provider rather than a retail seller of goods, it is highly unlikely that it would be able to operate and provide those services for any meaningful length of time in the event its reorganization efforts fail. In such a scenario, the Debtor would not be able to maintain and pay staff, thereby forcing it to shut down the North Raleigh Location with little warning. Card holders would consequently have little to no opportunity to redeem the gift cards. Further, in the event of liquidation or conversion, a bankruptcy trustee (whether in chapter 11 or 7) would face a myriad of problems inherent with a large class of administrative consumer claims with relatively small individual claim amounts.

---

[4] The reported cases do not indicate how these debtors treat gift card sales from an accounting perspective; while the orders themselves to not appear to restrict the use of funds until the gift cards are redeemed, it is unknown whether the debtors already treated those proceeds as unearned income or as operating income.

In addition, and perhaps most importantly, gift cards constitute a distinctively large portion of the Debtor's monthly income when compared to the retail store merchants constituting the debtors in reported cases that discuss gift card issues. Even though the Debtor's testimony and accounting on the subject may best be charitably described as "inconsistent," it appears that on average at least a third of the Debtor's annual income is derived from the sale of gift cards. *See* Dkts. 138, 158, and 210. In contrast, the typical brick and mortar store retailer's income does not rely nearly as heavily on the sale of gift cards, and instead generates virtually all revenue through the present sale of goods.

Finally, the Debtor's owner has given no indication that she would seek or otherwise anticipates that the business will be sold as a going concern. Several of the cases cited by the Debtor allowed the continued sale of gift cards based upon the assumption that an ultimate buyer of the debtor's business would honor postpetition gift cards through continued operations and assumption of postpetition liabilities. *See, e.g.*, *In re Quiksilver, Inc.* at Dkt. 65.

### 6.    Adequate Protection and Use of Proceeds

As outlined above, seemingly at every hearing in this case the Debtor seeks permission for the immediate use of one hundred percent of the postpetition gift card sales proceeds rather than the fifteen percent historical breakage rate. By mid-January, approximately $125,000 in unearned proceeds had accumulated in the segregated account. If the Debtor were permitted to spend those funds immediately (prior to gift card redemption) and subsequently was forced to close, those presently identifiable funds would be lost and could not be recovered later to provide a pool for return of the unearned funds. Without the segregated account, the Debtor effectively would have received a risk-free unsecured loan, without any consequence upon default. This potential result would be patently unfair to the gift card holders.

12

The Debtor has sought to provide replacement adequate protection to postpetition gift card purchasers in the form of a lien on its commercial real estate at the North Raleigh Location. The Debtor offered no legal basis or justification for the relief requested. Instead, the Debtor relied upon expert testimony, a broker's price opinion, and a market value appraisal to contend that sufficient equity existed in its real estate to grant a fifth or sixth position lien to postpetition gift card holders to ensure payment of their postpetition claims in the event of liquidation of the Debtor. The existence of equity in property, on its own, is insufficient to support the substitution of liquid collateral (cash proceeds held in a separate account) for illiquid collateral (a lien on real property).

A junior real estate lien under these facts is largely illusory and is no substitute for liquid funds in a protected bank account.  Perhaps a sixth position lien could be an appropriate mechanism for securing the loan of a sophisticated postpetition lender with the financial wherewithal to protect its junior lien position but here the individual claims of the gift card holders are so small (several hundred dollars at the most) and the sum of the senior liens so great (at least two million dollars) that any real estate collateral offered is effectively rendered meaningless. Simply put, the Debtor failed to articulate how the proposed substitution was equitable or justifiable, and the court finds that a sixth position lien to postpetition lenders with no notice and no representation fails to adequately protect the holders of unredeemed gift cards sold after the bankruptcy case filing date.

Segregation of postpetition card proceeds is an appropriate measure of adequate protection and does not impose an excessive burden upon the Debtor. Further, the court is not completely restricting the use of these funds. Rather, the court allowed the Debtor to use a percentage of postpetition gift card sale proceeds commiserate with the historical breakage rate in recognition of the fact that some gift cards are ever redeemed. And, of course, the Debtor is authorized to transfer

funds from its segregated account to its primary operating account upon the redemption of a postpetition gift card.

To be clear, the court recognizes that gift cards are a valuable product offering for the Debtor's business, and therefore is permitting the Debtor to use its business judgment in deciding whether or not to continue to sell gift cards while in chapter 11. However, the court will allow the continued sale of postpetition gift cards in the Debtor's discretion only where balanced by a corresponding protection for the postpetition gift card purchasers and holders, as the interests of this vulnerable subset of postpetition creditors must be balanced with the needs of the Debtor's continued operations. Should this case be converted with no gift card proceeds account, the postpetition gift card holders will be left with nothing but an administrative claim in a potentially administratively insolvent case, a result this court cannot countenance.

## CONCLUSION

No one is forcing the Debtor to sell postpetition gift cards. The segregation of funds required in the earlier orders issued in the case guards against potential administrative claims of remaining gift card customers by setting aside a pool from which refunds can later be drawn if necessary. The need for adequate protection in the form of a segregated bank account is the price required of the Debtor if it wishes to continue the sale of gift cards while in chapter 11.  For the reasons outlined above, and as set forth in the prior written orders, the Debtor may continue to honor gift cards sold pre-petition and continue to sell gift cards postpetition at its discretion and business judgment, but subject to the continued segregation of eighty-five percent of the sale proceeds as previously directed by the court.

## END OF DOCUMENT